Laeamoke, Judge,
dissenting:
I respectfully dissent for this reason: To recover, plaintiff must prove that at the time of his release he was not only unfit for service but that his incapacity was service-connected.
I think plaintiff has failed in his burden to prove that he in fact had a permanent incapacitating herniated disc at the time of his release. All the medical findings merely disclose that he had a probable herniated disc. Under these circumstances, I cannot say that the action of the Secretary of the Navy, acting through the Naval Retiring Review Board and the Board for Correction of Naval Records, was arbitrary, capricious, erroneous in law, or contrary to the evidence. Accordingly, I would dismiss plaintiff’s petition.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Richard Arens, and the briefs and argument of counsel, makes findings of fact as follows:
1. (a) Plaintiff was born in Brooklyn, New York, on May 21,1912, and is a resident of that state.
(b) On May 21, 1942, he was appointed ensign, United States Naval Reserve to rank from May 5,1942.
(c) On June 8,1942, he reported for extended active duty.
(d) On May 1, 1943, he was appointed lieutenant (junior grade, temporary), United States Naval Reserve.
(e) On August 23, 1944, he was appointed lieutenant (temporary), United States Naval Reserve.
(f) On April 4,1946, he was examined in connection with separation processing and was found to be physically qualified for release to inactive duty.
(g) On June 6, 1946, while serving in the rank of lieutenant, he was released from active duty under honorable conditions.
(h) Effective January 1, 1951, he was transferred to the inactive status list.
(i) On October 15, 1954, he ivas honorably discharged from the United States Naval Reserve.
2. In this suit, plaintiff seeks to recover the disability retirement pay of a lieutenant from April 4,1946. The amount of recovery, if any, is reserved for further proceedings.
*230 3. (a) In March 1912, plaintiff was given a physical examination by the Navy and was found fit to perform active duty at sea or on foreign service with no defects noted.
(b) On June 4,1942, he was given a physical examination by the Navy and found physically qualified for active duty in the Naval Reserve. No disqualifying defects were noted.
4. (a) On August 9, 1942, plaintiff was admitted to the U.S. Naval Hospital, Newport, Rhode Island, by reason of an automobile accident which occurred while he was on authorized liberty, but which was not the result of his own misconduct. The medical report reads in part:
When first seen, patient was still in the car, complaining of pain in the chest on breathing. He was bleeding profusely from a laceration over the left knee. Since there were no obvious major fractures or evidence of spinal injury, patient was transferred on a stretcher in the ambulance to the hospital. Patient was never unconscious. He states that on hitting the tree he was thrown forward over the wheel and his knees and forehead hit the dashboard.
$$$$$$ *
An operation was performed on plaintiff’s left knee. The immediate postoperative condition was reported to be good. The final diagnosis was “synovitis, traumatic, left knee, concurrent.”
(b) On October 20, 1942, he was discharged to duty.
(c) On December 25, 1942, plaintiff was admitted to the U.S. Naval Hospital, Newport, Rhode Island, where he complained of soreness of throat and an aching lower back. His condition was diagnosed as pneumonia, broncho.
5. On May 3, 1943, plaintiff was given a physical examination by the Navy and found physically qualified for temporary promotion. No defects were noted.
6. (a) On March 14, 1944, plaintiff was examined by a Special Board of Medical Examiners to determine his fitness for duty with the Amphibious Training Command, U.S. Atlantic Fleet. The medical report reads in part:
This officer temporarily disqualified for active amphibious operations at sea by reason of Low Back Pain.
Physical examination and x-ray fails to reveal organic explanation of symptoms.
*231 Recommend transfer to usNi-i, * * *, Betbesda, Md. for diagnosis, treatment and recommendations.
It is requested upon discharge from hospital that this officer be returned to this Board for re-examination and re-classification unless other disposition is indicated.
❖ * * * *
(b) On March 22,1944, he was admitted to the U.S. Naval Hospital, Bethesda, Maryland, for surgical observation. He gave a history of striking his sacrum against a bulkhead 2% months earlier. The medical report reads: “Since then has had increasing amount of pain on sitting; must extend leg to full length while sitting in a chair for relief.” After extensive studies, including proctoscopic, sigmoidoscopie, rectal examination, and A-P and lateral X-ray examination of the coccyx, which were negative, the ultimate diagnosis was contusion, coccyx.
(c) On April 4, 1944, he was discharged to duty.
(d) On May 18, 1944, he was reexamined by a Board of Medical Examiners and found to be physically and temperamentally qualified to perform all duties of his rank with the Amphibious Training Command, U.S. Atlantic Fleet.
(e) On September 25,1944, he was reexamined by a Board of Medical Examiners and found to be physically and temperamentally qualified to perform all duties of his rank with the Amphibious Training Command, U.S. Atlantic Fleet.
(f) On September 26,1944, he was given a physical examination at the Amphibious Training Base, Little Creek, Virginia, and found to be physically qualified for temporary appointment to lieutenant, USNR. No defects were noted.
<7. (a) On September 25,1945, plaintiff requested retention on active duty for one year from that date, pending application for transfer to the regular Navy.
(b) On October 16, 1945, he was informed that his request was approved, but that his retention on active duty until the date specified in his request was dependent upon future legislation and a continuing need for his services.
8. (a) On January 24, 1946, plaintiff, while climbing a ladder on board the ship of which he was the commanding officer, slipped and fell to the steel deck, eight feet below. He scraped his back and arms on the rungs of the ladder and *232 landed on bis lumbar back. He had immediate pain in the sacroiliac region and was unable to walk.
(b) On January 25, 1946, he was admitted to the U.S. Naval Operating Base Dispensary, Guantanamo Bay, Cuba. He was in moderate distress and complained of pain in his lower back. There was an abrasion about 2x3 mches to the lateral side of his left sacroiliac joint and motion of his left hip joint was restricted because of severe pain elicited in the left sacroiliac joint. X-rays revealed no evidence of fracture. The diagnosis was contusion, lumbar sacral, and left gluteal region. During his hospitalization, his general condition improved and he had almost complete motion without pain.
(c) On February 1, 1946, he was discharged to duty.
9. (a) On February 9, 1946, plaintiff requested release from active duty as he was no longer eligible for transfer to the regular Navy in accordance with the requirements of C/L 288-45.
(b) On March 27, 1946, orders were issued for plaintiff’s separation processing and release from all active duty in the U.S. Naval Reserve.
(c) On March 29, 1946, he applied for transfer to the regular Navy in commissioned-officer rank as legal specialist.
10. (a) On April 2, 1946, in connection with a physical examination for a permanent commission in the U.S. Navy, plaintiff signed a statement reading:
I certify that I have informed the Board of medical examiners of all bodily or mental ailments which I have suffered, and that, to the best of my knowledge and belief, I am at present free from any bodily or mental ailments.
(b) The report of the physical examination which was given plaintiff on that date contains, in response to a query on history of illness or injury, the following: “Fracture of left rib and patella in 1942; contusion of back in 1946.” The report also notes mild tenderness over plaintiff’s left sacroiliac joint. In response to a query as to a summary of defects, the report contains “None.” Plaintiff was found fit to perform active duty at sea or on foreign service and certified *233 to be physically qualified for transfer to the U.S. Navy with permanent commission as lieutenant.
11. (a) On April 4, 1946, plaintiff was given a physical examination for separation from service. The report of the examination includes, in response to a query on history of illness or injury, the following: “Fractured It. knee 1942 * * * contusion coccyx 1944.” Plaintiff’s spine and extremities were found to be normal. In response to a query as to summary of defects, the report contains the following: “Deviated nasal septum to rt. epteNd.” Pie was found fit to perform active duty at sea or on foreign service, and physically qualified to be released from active duty.
(b) On April 5, 1946, he was detached to terminal leave to expire June 6,1946.
12. On April 25, 1946, a Board of Medical Examiners, Navy Department, Washington, D.C., considered that plaintiff met the physical standards for appointment in the regular Navy and certified that he was physically qualified for appointment in the U.S. Navy.
13. (a) In the latter part of April 1946, plaintiff visited Dr. Samuel B. Burk, a physician and surgeon who was then in the private practice in New York City, but who in 1942 was a Navy doctor and had treated plaintiff when he was a patient at the U.S. Naval Hospital, Newport, Rhode Island, as a result of the automobile accident. (Finding 4(a), supra.)
(b) Plaintiff complained to Dr. Burk of pains in his back. Dr. Burk subsequently (by affidavit of February 14, 1956) summarized the examination which he conducted as follows:
* * * *
An examination of LOUIS L. WALTERS in the latter part of April 1946 was conducted. With all clothing removed, it was noted that there was a disturbance in the normal lordosis. The right hip and left shoulder were higher than the corresponding places on opposite sides of the body with an associated scoliosis accompanying same. In walking, it was noted that he favored the left lower extremity and there were callosities on his left foot resulting therefrom. On assuming a squatting posture, there was distress in the lower back which was more marked on attempting to rise. On manipulating *234 the kneecap, a rubbing sensation was observed. By-measurements, there was an increase in the vertical and horizontal measurements. The surface of the kneecap did not show the same smoothness as noted on the uninjured side. Detailed findings in the bach showed definite muscle spasms when he bent forward so that his finger tips were within 17" of the floor. With added effort and force, he reached with difficulty to within 8" of the floor, but this caused distress and he was not able to remain so except for a short period. Lasegue’s sign was bilaterally positive. Movements of the lower extremities in an upward direction when he was on his abdomen and later on his back caused distress and muscle spasms of the right and left spinal group. Hip flex-ion followed by knee extension also caused distress when both lower limbs were exercised. Body extension caused discomfort in the lower back. Lateral body bending exercises were not impaired. The patient pointed to the lumbo-sacral region as the area of maximum distress. The knee jerks were equal bilaterally. The left ankle jerk (tendo-Achilles reflex) was diminished. There was distress along the left sciatic nerve, and impairment in sensation on the outer side of the left foot and on to the upper surface of the left leg. There was limitation below the site of injury involving the various joints (hip, knee and ankle). X-rays taken at about the time of this examination showed a marked narrowing amounting to an obliteration of the interver-tebral space between the 5th lumbar and the 1st body of the sacrum. There was an ununited ligamentous chip fracture of the superior aspect of the patella with some bony proliferation extending from the patella to the bony fragment which was loosely situated in the prepatellar region. There was cortical irregularity of the superior aspect of the patella.
‡ 4* H* ‡ 4»
(c) Dr. Burk, at the time of the examination, held the opinion “that the findings, the phenomena associated with the examination, indicated that he [plaintiff] sustained an injury in the lumbar area involving the lumbar intervertebral discs.”[1]
(d) Dr. Burk prescribed “Physiotherapy, baking, massage, medication, to be followed later on, as indicated, by a *235 supportive belt or whatever may be indicated, depending upon his attacks as they came and went.”
(e) Following the foregoing examination, plaintiff continued his visits to Dr. Burk over succeeding years. Dr. Burk subsequently (by affidavit of February 14,1956) stated that plaintiff’s condition has become “progressively worse.”
14. On June 6, 1946, plaintiff, while serving in the rank of lieutenant, was released from active duty under honorable conditions.
15. On November 27,1946, plaintiff was informed that his name was not included in the recommendation of the Selection Board for appointment to the regular Navy.
16. (a) On July 15,1948, pursuant to orders of Dr. Burk, X-rays were taken of plaintiff by a Dr. Aarons (now deceased) of New York City. These X-rays were not subsequently presented to the Naval Retiring Review Board, nor to the Board for Correction of Naval Records, although they were alluded to in a statement by Dr. Burk which was submitted to the Board for Correction of Naval Records. They were, however, admitted in evidence at the trial.
(b) On July 26, 1948, Dr. Burk prepared and signed a statement (subsequently submitted to the Board for Correction of Naval Records) regarding these X-rays and his physical examination of plaintiff, reading in part as follows:
5; X-Rays taken recently show a marked narrowing which amounts to an obliteration of the intervertebral space between the fifth lumbar and the first body of the sacrum. There is an ununited ligamentous chip fracture of the superior aspect of the patella with some bony proliferation extending from the patella to the bony fragment which is loosely situated in the prepatellar region. There is cortical irregularity of the superior aspect of the patella.
PRESENT COMPLAINTS
Complains of pains in the lower back, left thigh and knee. Pains in the left lower extremity are increased with walking or standing for any length of time. The pain in the back is worse on trying to arise from a sitting posture after sitting for a while. All pains are bad when the weather is bad.
*236 EXAMINATION
With, all clothing removed it is noted that there is a disturbance in the normal lordosis. The right hip and left shoulder are higher than the corresponding places on opposite sides of the body with an associated scoliosis accompanying same.
In walking it is noted that he favors the left lower extremity and there are callosities on his left foot resulting therefrom.
On assuming a squatting posture there is distress in the lower back which is more marked on attempting to rise.
On manipulating the knee a rubbing sensation is observed. By measurements there is an increase in the vertical and horizontal measurements. The surface of the knee cap does not show the same smoothness as noted on the uninjured side.
Detailed findings in the back area show definite muscle spasm when he bends forward so that his finger tips are within 11" of the floor. With added effort (and force) he reaches (with difficulty) to within 8" of the floor but this causes distress and he is not able to remain so except for a short period. La Segries Sign is bilaterally positive. Movements of the lower extremities in an upward directed when he lies on his abdomen and later on his back cause distress and muscle spasms of the right and left spinal group. Hip flexion followed by knee extension also causes distress when both lower limbs are exercised. Body extension causes discomfort in the lower back. Lateral body bending exercises are not impaired. The patient points to the lumbo-sacral region as the area of maximum distress. The knee jerks are equal bilaterally. The left ankle jerk (tendo Achilles) is diminished. There are however no abnormal sensory changes.
DISABILITY
According to the patient he has been losing time from business, at least one, two or even three days a week. Distress is worse with barometric changes and this adds to his discomfort so that he appears at work late and returns early.
OPINION
It is my opinion after a review and examination of this patient that he has a definite low back condition *237 which became aggravated by the fall he had shortly prior to release from active duty. While under observation by me for about two years, the condition has become worse. A supportive brace is now under consideration to supplement physiotherapy.
At this time exploration with fixation of the sacro-lumbar must be discussed with the patient. At the same time, the presence or absence of dislocated intervertebral disc can be treated if found.
The disability should be considered as extensive at this time.
■17. (a) On July 20,1948, plaintiff was medically examined by the Veterans Administration. In his medical history, plaintiff listed the laceration of his knee in 1942 and that he had “injured [his] back in 8 ft. fall in 1946, Guantanamo Bay, Cuba.” He also noted that since his discharge he had been treated at the Brooklyn Naval Hospital and by a private doctor “for back & knee conditions.” He listed his complaints as:
Continuous low-back pain. Pain & weakness in It. knee & leg following excessive walking or standing. Occ. the back pain is very severe.
(b) Following item 40 of the report of the medical examination, entitled, “Eemarks — B. Summary of Pertinent and Interval History — C. Summary of Defects — D. Diagnosis,” the following was inserted: “(1) Residuals, moderate, old back injury, classified as sprain, chronic, lumbrosacral. (2) Residuals, moderate old fracture left patella.”
(c) The N-ray findings were reported as follows:
7/20/48
lumbosacral SEINE:
Very minimal hypertrophic changes are noted at the margins of the lower lumbar bodies. The lumbo-sacral angle, appears deep. The lumbo-sacral disc is narrow. The pelvis appears slightly tilted, the left iliac crest being at a higher level than the right. Whether this is organic or due to positioning cannot be determined on radiographic grounds alone. No other changes are noted at this time.
leet knee:
There is evidence of an old avulsion injury at the superior pole of the patella. Several irregular osseous *238 fragments are noted just above the patella, apparently strung out along the extensor tendon. There is noted considerable thickening of the extensor tendon close to its attachment to the patella. Minimal hypertrophic changes are noted at the upper articular margin of this structure. Elsewhere, the knee joint appears normal.
IMPRESSION:
Avulsion fracture of upper pole of patella, probably associated with laceration of the extensor tendon. Associated findings as noted.
(d) On October 4, 1948, plaintiff was rated by the Veterans Administration as follows:
“20% from 3/25/48
STRAIN, LUMBOSACRAL, CHRONIC
10% from 3/25/48
ERACTURE, PATELLA, LEET: RESIDUALS OF.”
He was given a combined rating of 30 percent from March 25, 1948, and was accordingly awarded monthly Veterans Administration compensation payments.
18. (a) On December 10, 1953, plaintiff was medically examined for disability evaluation by the Veterans Administration. His complaint was:
Pain in lower back and left knee in cold, damp weather. Sleeps on a stiff board. Severe pain on prolonged sitting or on exertion. Painful callouses on left foot.
(b) On January 18, 1954, on the basis of the foregoing examination, the rating action dated October 4, 1948, was confirmed and continued.
19. (a) The body of a letter, dated December 29, 1953, addressed to Dr. Burk, plaintiff’s physician, from the Veterans Administration reads:
We have been authorized by the above named veteran to furnish you with information regarding his case.
Mr. Walters was examined at this office m connection with disability evaluation:
RADIOGRAPHIC REPORTS: LUMBAR SPINE & SACRUM: Minimal hypertrophic spurring is seen along the margins of the bodies of the lumbar vertebrae. There is no evidence of bony injury. The lumbo-sacral angle appears stable.
*239 There are no appreciable bone anomalies. No arthritic changes are evident at the sacro-iliac joints.
left KNEE: Minimal osteo-arthritic spurring is seen along the posterior aspect of the patella. In addition, one notes the presence of large calcifico-osseous deposits in the soft tissues arising from the anterosuperior angle of the patella, and within the tendinous structures at this site.
pr chest: Negative.
hematology: Neutrophils: 59 Lymphocytes: 32 Monocytes: 3Eosinophils: 5Basophils: 1 Hemoglobin: 14.3 gms. 15.5 gms. — 100%.
urinalysis: Albumin: negative. Sugar: negative.
serology: No reaction was obtained in the New York State slide precipitation test for syphilis.
diagnosis: (1) Lumbosacral strain, chronic, recurrently symptomatic, moderately severe. (2) Fracture, healed patella, left, mild residuals.
This information is privileged and confidential and is released to you in your professional capacity.
(b) The body of a responding letter, dated January 22, 1954, addressed to the Veterans Administration from Dr. Burk reads:
This is to acknowledge with thanks your kindness in sending me your letter of December 29, 1953, in connection with examination of Louis L. Walters.
This patient has been under observation by me since he was out of the service. As a matter of fact, it was I who took care of his lower extremity when he was on duty up at Newport.
I find that my observations, which have been on an average of 3 to 6 months since his discharge from the service, coincide with the notations made in your letter, in which you indicate that the diagnosis is: (1) lum-bosacral strain, chronic, recurrently symptomatic, moderately severe, and (2) fracture, healed, patella, left, mild residuals.
I also find him permanently and partially disabled.
20. (a) On March 10,1954, in reply to an undated request of plaintiff for transfer to the Standby Deserve (Active Status) , the Bureau of Medicine and Surgery recommended that plaintiff be afforded a complete examination to include orthopedic consultation “with particular attention to left knee and back.”
*240 (b) By letter dated March 15, 1954, plaintiff was advised by the commandant of the Third Naval District in New York City that he had been found physically disqualified for active naval service by reason of “injury to left knee and back.” Plaintiff was requested to report to the commanding officer, U.S. Naval Hospital, St. Albans, New York, for reexamination which would include an orthopedic consultation “with particular attention to injury, left knee and back.”
21. On April 2,1954, plaintiff was admitted to a Veterans Administration hospital. The clinical record reads in pertinent part as follows:
FINAL SUMMARY
HISTORY: Patient was admitted with chief complaint of low back increasing in severity by coughing. Patient states that three days ago he noticed the sudden onset of pain and stiffening. He used bed-boards and heat. Patient states that the coughing causes the pain to be increased with radiation down thighs to above knee. Patient allegedly had injury in 1944. He was hospitalized for more than one month and then transferred to Bethesda. Patient has worn corset since that time for the pain.
physical examination : Is not remarkable except for straight leg raising which is limited to 15 degrees bilaterally.
laboratory & x-ray pindings: Blood studies were within normal limits. Chest was clear. Spine clear.
course in the hospital: Patient was admitted and placed in bed. The patient remained there until his temperature gradually subsided. He was reviewed by the Neurosurgeons who on examination felt that there was discogenic disease.
FINAL DIAGNOSIS :
h d d — Herniated dislocated disc.
Dg. 1. h.n.p. between L4 and L5 suspected. 2511-9X9Y. Treated — Improved.
operations : None.
present status of s.c. disabilities : Not examined for
complications: None.
special therapeutic procedure : None.
disposition : Discharged M. H. B. 4/17/54.
follow-up : 1 month.
*241 22. (a) The body of a memorandum dated May 1, 1954, addressed to the Bureau of Medicine and Surgery, Washington, D.C., from plaintiff reads:
1. It is requested that the necessary procedures be taken in my behalf for subject medical review in re injuries sustained in line of duty and disability resulting therefrom.
2. I have been a patient in the XJ.S. Veterans organization hospital, W. Kingsbridge Koad, Bronx, New York from April 2,1954 to April 17,1954 with total disability as a result of injuries sustained in line of duty.
3. I have been disabled since leaving active duty in the service and the conditions are getting progressively worse and are progressively disabling.
(b) The body of a responding letter, dated June 18,1954, addressed to plaintiff from the Chief of Naval Personnel (to whom plaintiff’s memorandum of May 1, 1954, had been forwarded) reads:
H5 ‡ '¡5 $
2. A review of your record discloses that you were examined on 4 April 1946 in connection with your separation processing and found to be physically qualified for release to inactive duty. On 5 April 1946 you were detached from the U.S. Naval Personnel Separation Center, Norfolk, Virginia, and on 6 June 1946 released from all active duty.
3. Only those inactive Reserve officers or former officers who have been discharged or released from active duty without pay pursuant to the finding of a board of medical survey, naval retiring board or physical evaluation board, thereby qualifying for the review provisions of section 302(a) of the Servicemen’s Readjustment Act of 1944, as amended (38 U.S.C. 693 (i)), may be considered for physical disability retirement with pay from the Navy. Since your release from active duty was an administrative action and not the result of a finding of one of the aforementioned boards, it is regretted that no further action may be taken on your request.
23. (a) On July 9,1954, plaintiff was medically examined for disability evaluation by the Veterans Administration. His complaint was “Severe pains in mid lower back, radiating to both thighs and legs as far as ankle — Pain gets worse *242 when bending down. Pains in left knee esp. in damp weather when it is sensitive.” The clinical record report on the nenrological examination contains the diagnosis: “No evidence of neurological disease after careful examination.”
(b) The body of a letter, dated August 20,1954, addressed to plaintiff from Brooklyn Begional Office of the Veterans Administration reads:
Your claim was reviewed on August 12,1954 based on your examination of July 9,1954 and all the evidence of record. It was determined that the present severity of your back condition warrants an increase in the disability evaluation from 20% to 40% and that the improvement in your left knee condition warrants a reduction in the disability evaluation from 10% to 0%.
Based upon the 40% evaluation for your back condition you will receive the sum of $63.00 per month from July 9, 1954, the date of said examination, less prior payments.
Your attention is directed to the attached Notice of Bight to Appeal.
(c) A letter dated September 3, 1954, addressed to Dr. Burk, plaintiff’s physician from the Brooklyn Begional Office of the Veterans Administration regarding the foregoing examination reads in part:
noRSAL SPINE: There is no evidence of fracture or slipping. One notes minimal, scattered hypertrophic spurring along the margins of the bodies of the dorsal vertebrae. The intervertebral spaces throughout maintain their usual width.
luMbar spiNe, sacrum & coccyx : Additional oblique views of the lumbosacral region reveal minimal hyper-trophic lipping along the margins of the articular facets of the lumbosacral joints. Otherwise, the findings are unchanged as compared with the previous study dated 6/3/54. Copy of that examination, made for treatment purposes, follows:
lumbosacral coccygeal spine : 6/3/54 There is very mild loss in normal lordosis to the lumbar spine. This is associated with some increased lordosis in the immediate lumbosacral spine. Also, there is mild instability in the lumbosacral angle. This angle is moderately steep. The 5th lumbar vertebral body is deeply set. There is mild narrowing, possibly developmental, between the bodies of 1-5 and s-1.
*243 There is minimal hypertrophic spurring noted at the articular margins of L-4 and 5. The sacro-iliac joints appear normal. Both hip joints are natural. One does note a very minimal right lateral rotatory scoliosis to the lumbar spine (supine position). There is no direct evidence of osseous or joint pathology in the sacro-coccygeal spine. One does note rather close proximity between the posterior spinous processes in the lower lumbar levels, in keeping with “kissing” posterior spinous processes.
DIAGNOSIS: Osteoarthritis of lumbosacral spine, dorsal spine and left knee.
Residuals of fracture, left patella, post-operative.
NP diagnosis : No evidence of neurological disease after careful examination.
if* iji
24. Under date of September 16, 1954, plaintiff filed an application with the Board for Correction of Naval Records for a correction of his naval record. The Board for Correction of Naval Records thereupon requested the Naval Retiring Review Board to furnish an advisory opinion regarding plaintiff’s physical condition at the time of his release from active duty, and requested that the records of the "Veterans Administration be consulted. This action was taken in accordance with an earlier directive from the Secretary of the Navy wherein it was provided that the Naval Retiring Review Board was to review and furnish to the Secretary of the Navy advisory opinions covering the medical questions presented in such cases as may be transmitted to it by the Board for Correction of Naval Records; and that upon completion of its review, the Naval Retiring Review Board was to transmit its record of proceedings to the Board for Correction of Naval Records.
25. On September 21, 1954, plaintiff was given a physical examination at the U.S. Naval Hospital, St. Albans, New York, for retention in the U.S. Naval Reserve. The consultation report of the orthopedic service reads in part:
if: $ $ $ $
X-rays of left knee — Either ossification of quadriceps tendon or non-union supero-lateral pole. Spine: Low lumbar lordosis narrowing L5-S1 and sclerosis factor F5-S1.
*244 IMPRESSION:
(1) Probably herniated N dsic [sic] L4-L5
(2) Non-union or ossification patella, left, patella tendon.
26. (a) On October 15, 1954, plaintiff was honorably discharged from the U.S. Naval Reserve.
(b) On December 10, 1954, the Bureau of Medicine and Surgery made a report on plaintiff, which reads in part:
*****
“3. In reviewing the subject officer’s medical record, together with enclosure (1) in connection with his physical fitness for service, it is noted in the latter that _ he presents certain impairments which, while disqualifying for original appointment in accordance with the standards set forth in reference (c) [Chapter 15, MMD], are not considered to be disqualifying for retention in the Naval Reserve or for orders to active duty, provided a waiver is issued as provided by reference (c) [Chapter 15, MMD].
“4. In the event it is desired to order him to active duty, the defects listed below whould [sic] be waived under the provisions of reference (c) [Chapter 15, MMD].
fl) Low back pain syndrome
(2) Injury to knee, sequelae of
“5. The impairments noted in paragraph 4., above, are considered to be of sufficiently serious nature or severity to warrant notation on a control card in the Bureau of Naval Personnel since they are likely to limit his duty assignment. The appropriate physical risk classification is £C’ — physically qualified for active duty incident to mobilization only.”
27. (a) On September 28,1955, the Naval Retiring Review Boai’d conducted a hearing on plaintiff’s case. The membership of the Board consisted of three captains of the U.S. Naval Reserve and two captains of the regular Navy. Two of the five members were medical members, one of whom was in the Medical Corps of the regular Navy and one of whom was in the Medical Corps of the Naval Reserve. Plaintiff, accompanied by counsel, appeared and testified. There were introduced several documents including reports of medical examinations of plaintiff.
(b) The transcript of the proceedings reflects the following statement by the recorder, a commander of the U.S. *245 Navy, who, together with the members of the Board, was named by the Secretary of the Navy:
With the permission of the Board, I should like at this time to, in effect, reiterate the request of the Board for Correction of Naval Records that we determine the condition of the Applicant as of the date of his release from active duty. The Applicant alleges that injuries sustained while in service have become disabling to the point where he considers he should have been retired as of the date of release from active duty.
Just as a reminder to the Board, this case, like all others that comes before it, presents three main issues for determination: One of incapacity; one of permanency ; and the other is the cause of the incapacity and whether or not the cause was an incident of the service.
Now, disability has been defined by the Attorney General and by the Judge Advocate General as:
“a condition,. bodily or mental, which -unfits at present, or is likely to unfit in the near future the officer for the performance of his duties.
“The physical disability must be a permanent, incurable disease, or injury of such a character as absolutely to disqualify for duty on the active list. * * * If, however, the disease be curable or of such a character as to yield to treatment, then, even though a cure may require considerable time, the disability is not permanent.”
* * * ❖ *
(c) The transcript of the proceedings reflects the following:
* * * * *
The Naval Retiring Review Board thoroughly reviewed all the available records, including those furnished by the Veterans Administration, in the case of ex-Lieutenant Louis Leonard Walters, U.S. Naval Reserve, 167114, and carefully considered the additional evidence presented, the testimony of the Applicant, and the statements and arguments of Counsel.
After deliberating on the evidence before it, the Board is of the opinion that, at the time of his release from active duty on 6 June 1946, ex-Lieutenant Walters was suffering from low back pain and residuals of injury, left knee, but that these conditions were not of such character as to disqualify him for active naval service, within the meaning of the then existing retirement laws.
*246 28. (a) On March. 26, 1956, the Board for Correction of Naval Records held a hearing on plaintiff’s case, during which plaintiff appeared, accompanied by counsel, and testified. At the conclusion of the hearing, the Board referred the records and the transcript of testimony to the Chief, Bureau of Medicine and Surgery, for an advisory opinion.
(b) Under date of February 20, 1957, the Chief, Bureau of Medicine and Surgery, sent to the Chairman, Board for Correction of Naval Records, an advisory opinion in plaintiff’s case, the body of which opinion reads:
1. Returned with the following advisory opinion regarding the petitioner’s physical condition at the time he was released from active duty within the contemplation of the then existing retirement laws. In connection therewith, the Bureau’s attention was invited to the affidavit sworn to on 14 February 1956 by Dr. Samuel B. Burk. This affidavit, the material in the enclosures, and the Veterans Administration claim folder in the petitioner’s case have been reviewed.
2. The available medical record reveals that the petitioner was admitted to the sick list at the U.S. Naval Hospital, Newport, Rhode Island on 8 August 1942 by reason of an automobile accident. Two days later the diagnosis was established as wound, laceration, left knee, which on 81 August was changed to synovitis, traumatic, by reason of concurrent. His condition improved and he was discharged to duty on 10 October 1942. On 14 March 1944 the petitioner was examined by a special board of medical examiners and found disqualified for active amphibious operations at sea by reason of low back pain. Fie was admitted and transferred on 22 March 1944 to the U.S. Naval Hospital, Bethesda, Maryland where he gave a history of striking his sacrum against a bulkhead two and one half months earlier. Following the accident he had increasing amounts of pain over the coccygeal region. Extensive studies including proctoscopic, sigmoidoscopic, rectal examination and A-P and lateral x-ray examination of the coccyx were negative and he was discharged to duty on 4 April 1944.
The petitioner was admitted to the Dispensary at the U.S. Naval Operating Base, Guantanamo Bay, Cuba on 25 January 1946 with the diagnosis of contusion, lumbar sacral and left gluteal region. He gave a history of slipping on a ladder, falling approximately eight feet, *247 and injuring his back. Recorded history indicates that as he fell he scraped his back and arms on the rungs of a ladder and that he landed on his lumbar back on the steel deck with immediate pain in the sacroiliac region that prevented walking. Examination revealed an abrasion to the lateral side of the left sacroiliac joint and restricted motion because of severe pain in the left sacroiliac joint. X-rays revealed no evidence of fracture. After six days hospitalization the petitioner had almost complete motion without pain and he was discharged to duty the following day on 1 February 1946.
The petitioner was subsequently examined on 2 April 1946 at which time no defects were reported although mild tenderness over the left sacroiliac joint was noted. The board of medical officers expressed the opinion that he was physically qualified for transfer to the Regular Navy. Two days later, on 4 April 1946, he was again examined for release from active duty and again no defects were noted except a deviated nasal septum. On 15 April 1946, while on terminal leave, he was admitted to the sick list at the U.S. Naval Air Station, Miami, Florida with a furuncle of the left thigh for which he received treatment until 22 April 1946. He recovered from this condition while under treatment and on 22 April 1946. was discharged to duty fit for the same. His record during this period of hospitalization contains no report of complaints referrable to his back nor is there any reference to a prior consultation with a civilian physician regarding back complaints. When released from active duty he was considered physically qualified to perform all his duties and as late as 20 December 1954 was still considered physically qualified for unrestricted duty in the U.S. Naval Reserve.
3. The Veterans Administration claim folder indicates that the petitioner was examined on 20 July 1948 at which time he gave a history of back pain and pain and weakness in the left knee and leg following excessive walking or standing. Occasionally the back pain was very severe. Physical examination revealed moderate spasm of the spinal muscles and moderate tilt of the pelvis to the right. There was loss of lordosis, moderate limitation of forward flexion, and extreme voluntary limitation of hyperextension. Lateral flexion was normal. Lasegue’s sign was negative. Ankle jerks were equal and physiologic and x-rays of the spine were interpreted as normal by the examining physician. The x-ray report indicated the presence of very minimal *248 hypertrophic changes at the margins of the lower lumbar bodies. The lumbosacral angle appeared deep and the disc appeared narrowed. However, the pelvis was tilted and repeated studies were not conducted so that no statement could be made as to the nature of the tilting or the narrowed disc. In October 1948 the petitioner was assigned a twenty percent rating for lumbosacral strain, chronic, and ten percent for fracture of the patella, left, residuals of, with a combined rating of thirty percent to rate from 25 March 1948.
The petitioner was examined by the Veterans Administration on 10 December 1953 and his complaints were of pain in the lower back and left knee which he related especially to cold and damp weather. Physical examination was normal and a neurological examination showed no evidence of reflex disturbances. Orthopedic examination showed normal contours to the back with forward flexion restricted to a sixteen inch reach from the floor and pain on straight leg raising. There was no muscle atrophy and no sensory changes. _ The diagnosis was again lumbosacral strain, chronic, recurrently symptomatic. X-ray examination of the lumbosacral spine taken on the following day indicated minimal arthritic spurring as seen along the bodies of the lumbar vertebrae and there was no evidence of bone injury or abnormality. Arthritic changes were also found on the posterior aspect of the patella, left knee. No arthritic changes were evident at the sacroiliac joints. On 20 January 1954 the preceding disability rating was confirmed and continued.
On 1 April 1954 the petitioner was examined by reason of a brief, less than twenty-four hour history of an acute flare-up of lumbosacral strain. At that time the examining physician stated that the petitioner had no signs or symptoms of herniated disc and no neurological signs. He was seen by the orthopedic staff which considered his diagnosis to be lumbosacral strain. The petitioner left before treatment could be prescribed but was admitted to the Veterans Administration hospital on the following day and discharged on 17 April 1954. During the hospitalization he gave a history of increasing back pain with coughing and his personal physician had recommended hospitalization “to get rid of the phlegm in his chest.” Physical examination was negative except that straight leg raising was limited to fifteen degrees bilaterally. It was the impression of the neurosurgeons that he had discogenic disease.
*249 The petitioner requested reevaluation and he was again examined on 9 July 1954 when the examining physician diagnosed osteoarthritis of spine and knee. X-ray examination on 9 July showed no change during the preceding seven month interval and the x-rays were unchanged when compared with the previous study of 3 June 1954. The later reports indicate some increase in lordosis in the lumbosacral spine with a deeply set fifth lumbar vertebra and mild instability of the lumbosacral angle. Again a mild narrowing of the L5-S1 intervertebral space was noted that was suggested to be possibly developmental. X-rays in the oblique views showed hypertrophic lipping of the articular facets of the lumbosacral joints and views of the dorsal spine revealed minimal scattered hypertrophic spurring along the margins of the dorsal vertebra. The radiologist also noted rather close proximity between the posterior spinous processes of the lower lumbar levels in keeping with “kissing posterior spinous, processes.” Neurological examination revealed no evidence of motor weakness or atrophy in the lower extremity. Reflexes were equal. Straight leg raising was limited but there was a patchy sensory loss over the anterior surfaces of both thighs and the lower one third of the outer surface of the right leg. On the basis of these findings his rating was revised on 12 August 1954 to forty percent for his lumbosacral condition and zero percent for the patella injury.
In March 1955 the petitioner had further pain in his back which responded to conservative treatment and a report of a special examination on 1 August 1955 revealed forward flexion to twenty inches from the floor that was limited by the development of pain and positive signs on straight leg raising. Another neurological examination on 26 September 1956 showed sensory reception to be intact with the exception of the suggestion of hypesthesia on the lateral aspect of both calves and feet. The possibility of a herniated intervertebral disc was. suggested and the need for a myelogram and possible surgery was advanced. However, the petitioner continued to desire conservative treatment until no other alternative was available to him.
4. It appears from the record that Samuel B. Burk, Captain (Medical Corps) U.S. Naval Reserve (Retired) attended.the petitioner on various occasions since release from active duty and has signed several statements with respect to the petitioner’s condition. Copies of his statements dated 16 July 1948,26 July 1948, 22 January 1954 *250 and 28 May 1954 have been obtained and incorporated in the medical record for consideration by the Board. With the exception of the reported finding of a markedly narrowed intervertebral space amounting to an obliteration, these documents are in substantial agreement with the data reported by the Veterans Administration.
5. In view of the foregoing, it appears that the petitioner sustained injuries to his lower back area in 1944 and 1946. In the first instance his pain was located near the tip of the spine over the coccyx and was relieved by treatment following which he was returned to duty. On the second occasion he had evidence of abrasionslateral to the left sacroiliac joint with evidence of pain over that joint. His symptoms rapidly improved and he was returned to duty, being fit for same. He was found physically qualified for transfer to the Regular Navy and for release from active duty in April 1946 and he had no complaints relative to back when hospitalized in that month. When examined two years later by the Veterans Administration he presented evidence of a back complaint that became worse on excessive walking or standing and that later was reported to become worse with changes of the weather, particularly inclement weather. The petitioner continued to have intermittent episodes of back pain but extensive studies did not indicate that disc disease might be present until April 1954 or eight years after release. X-rays in 1953 and 1954 showed evidence of arthritic spurring at more than one level in the spine suggesting the development of a generalized osteoarthritic process and this diagnosis is not inconsistent with the history .and findings. The x-ray taken subsequent to release from active duty showed in addition a mechanical instability of the lumbosacral joint and minimal, perhaps developmental narrowing of the L5-S1 intervertebral interspace. The instability of this joint or the early arthritis or both are sufficient to explain the petitioner’s pains reported by the Veterans Administration prior to April 1954. The possibility exists that the arthritis caused the sensory disturbances reported in the left leg beginning with the hospitalization in April 1954. It was during this hospitalization that the diagnosis of a herniated intervertebral disc was first recorded but myelographic studies have been refused by the petitioner and the diagnosis remains uncertain. However, inasmuch as evidence indicating the presence of a ruptured disc did not appear until eight or ten years after the injuries on active duty, it is considered *251 unreasonable to assume that this condition was dormant, though incurred, during this period only to show itself spontaneously in April 1954. This is particularly so in view of the fact that there is more than, one possible source of the petitioner’s pain and also in view of the fact that a person with degenerative disc disease that has developed without antecedent trauma may rupture a degenerated disc following such simple acts as bending, lifting, sneezing, or coughing.
6. The Naval Retiring Review Board met on 28 September 1955 and conducted a hearing in the petitioner’s case pursuant to a request for an advisory opinion from the Board for Correction of Naval Records. The petitioner appeared in person and discussed his case at length. After deliberating upon all of the evidence before it, the Board was of the opinion that the petitioner was suffering from low back pain and residuals of injury left knee, at the time of his release from active duty in 1946, but these conditions were not of such a character as to disqualify him for active naval service within the meaning of the then existing retirement laws. This recommendation is not unreasonable and is considered to be consistent with the greater weight of the evidence in the petitioner’s case.
7. The petitioner was present for a hearing of his case before the Board for Correction of Naval Records on 26 March 1956 at which time he offered testimony and an affidavit sworn to on 14 February 1956 by Samuel B. Burk, Captain (Medical Corps) U.S. Naval Reserve (Retired). Dr. Burk indicates that an examination of the petitioner was conducted in the latter part of April 1946 and that as the result of this and his subsequent examinations he is of the opinion that the petitioner presently has a ruptured intervertebral disc that existed at the time of the petitioner’s separation from active duty. X-rays taken by Dr. Burk are reported to show what amounted to obliteration of the intervertebral space between L5-S1. The affidavit is at variance with the medical evidence reported in the naval and Veterans Administration medical records and also is inconsistent with the statements previously submitted by Dr. Burk himself.
8. In view of the foregoing, it is the opinion of this Bureau that the evidence now available does not establish that Walters did have a herniated intervertebral disc when released from active duty on 6 June 1946. To the contrary it appears that the greater weight of the evi- *252 deuce supports the conclusion that be was, when released from active duty on 6 June 1946 physically fit for full duty and that he remained fit for duty for a considerable period of time thereafter.
29. (a) By memorandum dated March 14,1957, the Chairman, Board for Correction of Naval Records, advised the Secretary of the Navy as follows:
Sub]: WalteRS, Louis L. former Lieutenant, USNR, 167114; Review of naval record.
Ref: (a) Legislative Reorganization Act of 1946, as amended (65 Stat. 655).
(b) Transcript of bcNR Hearing.
Enel: (1) Copy of reference (b).
1. Pursuant to the provisions of Section 207 of reference (a), subject former officer, hereinafter referred to as Petitioner, filed written application with this Board requesting that his naval record be corrected to show that he was retired by reason of physical disability following his release from active duty on 6 June 1946.
2. The Board reviewed Petitioner’s allegations of error and injustice on 26 March 1956. Petitioner appeared with counsel, Mr. C. N. Florence, American Legion and gave testimony in support of his application. Documentary material considered by the Board consisted of the written application, related correspondence, naval records, advisory opinions of the Naval Retiring Review Board and the Chief, Bureau of Medicine and Surgery, and applicable statutes, regulations and policies. The Board concluded its deliberations on 11 March 1957.
3. The Board, having reviewed all of the facts of record pertaining to Petitioner’s allegations of error and injustice, finds as follows:
a. that prior to filing his application with this Board Petitioner exhausted all administrative remedies afforded him under existing law and regulations within the Department of the Navy.
b. that Petitioner was born on 21 May 1912, and appointed Ensign, United States Naval Reserve on 25 May 1942 to rank from 5 May 1942; reported for extended active duty on 8 June 1942,- appointed Lieutenant (junior grade) (temporary), United States Naval Reserve on 1 May 1943; appointed Lieutenant (temporary), United States Naval Reserve on 23 August 1944; released from all active duty on 6 June 1946, physically qualified for same; *253 transferred to inactive status list effective 1 January 1951; honorably discharged effective 15 October 1954.
c. that on 1 May 1954 Petitioner wrote to the Bureau of Medicine and Surgery requesting a review of his medical record because of a service incurred disability which he stated was getting progressively worse and disabling. Petitioner was advised that the provisions of Section 302 of the Servicemen’s Readjustment Act of 1944, as amended were not applicable in his case, since he was not released from active duty without pay, by reason of physical disability. Petitioner subsequently applied to this Board for corrective action.
_ d. that a review of Petitioner’s medical record disclosed that shortly before midnight on 24 January 1946 he slipped and fell while climbing a ladder aboard ship. Pie received medical treatment and the following entry was made in his medical record: Date 25 January 1946: Diagnosis: Contusion, Lumbar Sacral and Left Gluteal Region #2512. KL “G”. There is also evidence of record (clinical records) that Petitioner received medical and surgical treatment for fractured rib and patella (knee) on 18 August 1942. These injuries were received when he accidently drove his car into a tree in a dim out area. He was also hospitalized on 22 March 1944 and treated for contusion, coccyx #2512.
_ e. that Petitioner contends that he is now totally disabled because of a back and spine condition and was granted a 40% disability rating by the Veterans Administration because of his service incurred disabilities.
f. that in view of the fact that Petitioner’s application presented questions of medical fact, the records in his case were referred to the Naval Retiring Review Board on 8 December 1954 for an advisory opinion. The Naval Retiring Review Board conducted a hearing in subject case on 28 September 1955. Petitioner appeared with his counsel, Mr. C. N. Florence, American Legion and gave testimony in support of his claim. The Naval Retiring Review Board advised the Board as follows:
“After deliberating on the evidence before it, the Board is of the opinion that, at the time of his release from active duty on 6 June 1946, ex-LT Walters was suffering from low back *254 pain and residuals of injury, left knee, but that these conditions were not of such character as to disqualify him for active naval service within the meaning of the then existing retirement laws.”
g. that Veterans Administration letter dated 31 January 1955 states that Petitioner was granted compensation based on a 30% disability rating by reason of Strain, Lumbosacral, chronic and Fracture, (20%); Patella left, Residuals of (10%) from 25 March 1948. By rating Board decision dated 12 August 1954 the disabilities were evaluated as follows:
Lumbosacral injury and weakness 40% from 9 July 1954; Healed Fracture, left Patella 0% from 9 July 1954.
Amended award dated 20 August 1954 authorized payment of 40% compensation from 9 July 1954.
h. that following the hearing in subject case the Board decided to refer the records and the transcript of hearing to the Chief, Bureau of Medicine and Surgery for an advisory opinion. The Chief, Bureau of Medicine and Surgery, on 20 February 1957, rendered a six page opinion which concluded as follows:
“xxx In view of the foregoing, it is the opinion of this Bureau that the evidence now available does not establish that Walters did have a herniated intervertebral disc when released from active duty on 6 June 1946. To the contrary it appears that the greater weight of evidence supports the conclusion that he was, when released from active duty on 6 June 1946, physically fit for full duty and that he remained fit for duty for a considerable period of time thereafter.”
i. that in view of the foregoing findings the Board now finds that there is no evidence of error or injustice in Petitioner’s naval record and consequently no change, correction or modification of his naval record is warranted.
DECISION:
After careful consideration of Petitioner’s naval record, evidence submitted by him or on his behalf and *255 applicable statutes, regulations and policies tbis Board concludes that under normal standards of naval law, administration and practice no correction of his naval record is warranted.
4. It is certified that quorum was present at the hearing and at the Board’s deliberations, and that the foregoing is a true and complete record of the Board’s proceedings in the above entitled matter.
SIGNED
E. W. BREW
Assistant Recorder
5. The foregoing action of the Board is submitted for your review and action.
(b) On March 15, 1957, the foregoing memorandum was reviewed and approved by the Assistant Secretary of the Navy and was approved by the Secretary of the Navy.
(c)' By letter dated March 21,1957, plaintiff was advised by the executive secretary of the Board for Correction of Naval Records that the Secretary of the Navy had approved the final decision in his case.
30. (a) By letter dated June 16,1958, plaintiff petitioned the Board for Correction of Naval Records for reconsideration of his case. His letter was accompanied by enclosures including an affidavit dated June 13,1958, of Dr. Thomas Q. Garvey who stated that he had examined certain records in plaintiff’s case and had conducted a physical examination of plaintiff and that it was his opinion that plaintiff “has physical impairments indicating that he suffers from the effects of a ruptured intervertebral disc which developed slowly and progressively since 1944 up to the present time * * *” and that “said condition of a ruptured intervertebral disc was such a condition that would make him physically unfit for active duty in the U.S. Navy in April 1946, and thereafter to date.”
(b) The body of a responding letter, dated June 25, 1958, addressed to plaintiff from the executive secretary of the Board reads:
Your letter of 16 June 1958 and enclosures thereto have been carefully reviewed.
_ Inasmuch as you have not presented any new, pertinent, relevant evidence, not previously considered, the *256 Board is prohibited by regulation from recommending to the Secretary of the Navy that your case be reopened. Difference of opinion in medical judgment is not considered a proper basis for reopening a case that has been finally adjudicated. Neither is an award of compensation granted by the Veterans Administration considered to be pertinent to retirement rights. Retirement rights are granted upon a finding that a service member’s degree of disability, at the time of his release from active duty was such, that he was not able to perform the duties of his rank, or in other words that he was physically incapacitated to perform the duties of his rank within the contemplation of the then existing retirement laws.
A further review of your naval record discloses that competent naval medical authorities determined, after exhaustive studies of your medical history that your degree of disability at the time of your release from active duty was not of such severity as to be considered incapacitating within the contemplation of the retirement laws.
The Board regrets that the circumstances of your case are such that it was unable to grant your request for a correction of your record.
(c) By letter dated July 10, 1958, plaintiff appealed to the chairman of the Board for Correction of Naval Records for the Board to reconsider his case “in the light of the new evidence presented.”
(d) A responding letter, dated August 13,1958, addressed to plaintiff from the chairman of the Board for Correction of Naval Records reads in part:
* * * * *
It is noted from the statement of Doctor Thomas Q. Garvey that he is of the opinion that you have a herniated' intervertebral disc; that your condition had its origin while you were on active duty; and that you were unfit for active duty by reason of such condition in April 1946.
Although the possibility that events occurring while you were on active duty may have been causally related to a herniated intervertebral disc from which you may now be suffering, and although the establishment of such a chain of causation would be pertinent to a determination of whether your present disability is “service connected” for purposes of establishing entitlement to Veterans Administration compensation, these questions *257 are not pertinent to the establishment of your entitlement to military disability retirement benefits under laws in effect at the time of your release to inactive duty. The substance of Doctor Garvey’s opinion appears to be that in retrospect it would be reasonable to presume that you did have a herniated intervertebral disc in 1946, and that if you did havej you were of necessity incapacitated for active naval service.
The long standing criteria of incapacity for service recognize that members of the service may have physical defects but not be incapacitated thereby and that members of the service are not all required to have equal physical capacities. Whether or not an officer is incapacitated for service depends upon whether he can perform the duties of his rank in such a manner as to reasonably fulfill the purpose of his employment on the active list. Neither a diagnosis nor the presence of disability is disqualifying and in every instance due regard must be given the individual’s functional impairment.
The Board’s conclusion in your case that you were not incapacitated for active duty is in accord with advice received from the Naval Retiring Review Board and the Chief of the Bureau of Medicine and Surgery. The opinion of Doctor Garvey to the contrary may be based on erroneous criteria of incapacity for naval service.
* * * su *
31. (a) At the trial, plaintiff produced two medical witnesses, Dr. Samuel B. Burk and Dr. Marvin Curtis Koren-gold. Dr. Burk, a traumatic surgeon of New York City and a member of the American College of Surgeons, retired as captain in the Naval Reserve in 1949, after having served on active duty as a member of the Naval Reserve for a period of 22 months during World War I, and from December 1941 until April 1946 during World War II. Dr. Korengold, a Washington, D.C., physician, who since 1955 has been in the private practice of neurology, is a consultant in neurology to the Veterans Administration and an instructor in neurology at the George Washington University School of Medicine, Washington, D.C.
(b) Dr. Burk, as heretofore indicated, as a Navy doctor in 1942, had treated plaintiff when he was a patient at the United States Naval Hospital, Newport, Rhode Island, as a result of the automobile accident (finding 4(a), supra), and beginning in April 1946 had, as a private physician and sur *258 geon, treated plaintiff for Ms back condition (finding 13, supra). Dr. Burk testified at length regarding plaintiff’s physical condition as it appeared in certain physical examinations and X-rays. He stated that in the April 1946 examination of plaintiff he found phenomena relating to plaintiff’s back which “were the early stage of an intervertebral disc injury.” He further testified that after the X-rays which he ordered were taken of plaintiff in 1948 his diagnosis was “a ruptured nucleus pulposis, a ruptured intervertebral disc at the junction of the fifth lumbar vertebra and the first sacral segment” and that this is a permanent condition which is not curable. Dr. Burk expressed the opinion, based upon his experience on medical survey boards in the Navy, that in April 1946 plaintiff had “sustained an injury to the inter-vertebral disc which would disqualify him from active service.” He also expressed the opinion that there was a causal relationship between the injuries which plaintiff suffered in 1944 and in 1946 and the condition of his back at the time he examined plaintiff in April 1946. On cross-examination, Dr. Burk stated in effect that although in his letter of January 22, 1954, to the Veterans Administration (finding 19(b), supra) he expressed agreement with the diagnosis made by the Veterans Administration doctor, he did so because he “didn’t want to differ with him as a matter of courtesy to hurt his feelings”; but, that in fact he differed with the Veterans Administration doctor in the diagnosis.
(c) Dr. Korengold testified that he first examined plaintiff in September 1956 on behalf of the Veterans Administration and concluded that plaintiff was suffering from a ruptured intervertebral disc and that “tMs had been present, in essence, since his time in service”; that he reexamined plaintiff on December 1, 1961, and again on March 12, 1962, at the request of plaintiff’s attorney and concluded that plaintiff was continuing to suffer from a ruptured intervertebral disc. He further testified that plaintiff has suffered numerous remissions and exacerbations of his disc pathology; that the examination given plaintiff on April 4, 1946, by the Navy was not adequate considering the history and circumstances for which the examination was being given, and that if plaintiff *259 had been given a proper examination “signs would have been most likely found, indicating the presence of this disorder, although to a much milder degree.” Dr. Korengold stated that in 1956 he reported that the plaintiff had signs and symptoms suggesting a prolapsed intervertebral disc, but that he did not make a firm diagnosis regarding it. A ruptured intervertebral disc is not curable, Dr. Korengold said. “The best we can hope to produce is a remission of discomfort, partially or completely, but always with limitation and concern for further recurrence,” he stated. He asserted that plaintiff’s condition is a permanent one. He continued:
A person with a ruptured intervertebral disc has to be very careful of any type of physical activity. He may have days, weeks or even months in which he is relatively free of discomfort, but it takes only one false move, just a single split second, to reverse the entire normalcy into acute pathology. Bending over to pick up a piece of paper on the floor, bending down to open a drawer of a bureau that is moderately low to the floor — all may precipitate acute or subacute type of distress; therefore, anyone who has this type of condition is cautioned on these types of activities, is advised to do no heavy lifting, no pushing, to avoid doing any bending, without special precautions.
On cross-examination, Dr. Korengold stated that he had not seen, nor did his opinion testimony take into account, certain medical records in the case; but, that in making his diagnosis in 1956, he relied on X-rays which had previously been taken of plaintiff, the examination which he conducted, and plaintiff’s history. He did not significantly qualify his prior testimony after being shown such medical records and/ or interrogated regarding them.
32. (a) At the trial, defendant produced two medical witnesses, Dr. Robert H. Brown and Dr. Robert William Mackie. Dr. Brown is in the Medical Corps, U.S. Navy, and is assistant chief of orthopedic surgery at the U.S. Naval Hospital, Bethesda, Maryland. He is Board-certified in the American Board of Orthopedic Surgery and is a member of the American Academy of Orthopedic Surgeons. He regularly performs orthopedic surgery and has occasion to examine, treat, and perform surgery on disc patients and fre *260 quently reads and interprets X-rays. Dr. Mackie is in the Medical Corps, U.S. Navy, and is chief of neurosurgery at the U.S. Naval Hospital, Bethesda, Maryland. He is Board-certified by the American Board of Neurological Surgery. He regularly performs surgery, including disc surgery and has served on boards whose purpose it is to decide fitness for duty.
(b) Dr. Brown interpreted at the trial 11 X-ray films taken of plaintiff’s spine during 1948 and 1954. He testified that the films were a good series and showed a normal spine for plaintiff’s age. He expressed the opinion, based on certain medical records in plaintiff’s case until but not after April 4, 1946, that plaintiff did not have a herniated inter-vertebral disc at the time of his release from active duty in 1946. The medical records on which he based the foregoing opinion, however, did not include a complete medical history of plaintiff’s case until April 1946. Dr. Brown stated that if he were advised that plaintiff was in constant pain between his injury in 1944 and his injury in 1946, and that the pain was in the lower-back region, and that he had received treatments for that condition by a corpsman while on duty, that he [Dr. Brown] would change his opinion as to the ultimate diagnosis. He said that based upon all of the medical records in the case it was his opinion that at the present time plaintiff is suffering from a lumbosacral strain, with a possibility of a midline [slipped] disc. Dr. Brown expressed agreement with the diagnosis made in September 1954 at the U.S. Naval Hospital, St. Albans, New York (finding 25, supra), that plaintiff probably had a herniated disc between L4 and L5. He stated that a ruptured inter-vertebral disc is a disease of such character that it generally yields to treatment but that it is not curable. He testified further that there are many men performing full active duty in the Navy, particularly in the officer grade, who have undergone disc surgery. Regarding the demobilization examinations in 1946, Dr. Brown said, “There was Congressional pressure on the part of parents of the boys to get them out and they tried to open the gates as rapidly as they could.”
(c) Dr. Mackie interpreted at the trial X-ray films taken of plaintiff’s spine. He testified that certain of the films *261 were good and “were essentially normal.” Based upon plaintiff’s medical records until April 4, 1946, Dr. Mackie expressed tbe opinion that plaintiff did not have a ruptured intervertebral disc when he was discharged on June 6,1946; but, based upon plaintiff’s medical records subsequent to April 1946, Dr. Mackie expressed the opinion that plaintiff “may have had or had a ruptured intervertebral disc.” He further expressed the opinion, based upon his service on boards whose purpose it is to decide whether or not a person is fit for duty, and upon his examination of the records in the case that plaintiff was fit for active duty at the time of his discharge. He said that he had observed both officers and enlisted men who had undergone surgery for a ruptured intervertebral disc who have been returned to full duty subsequent to surgery.
33. (a) Pertinent provisions of the manual of the Medical Department, United States Navy (September 25,1945) read:
2117. Retirement of Officers. — Physical examinations for retirement shall be conducted in accordance with the instructions in paragraph 21110, in Naval Courts amd Boards, and in Chapter 44, Navy Regulations.
*****
21110. Physical Examination of Officers Prior to Resignation,i Discharge, Dismissal, or Retirement for Age or Failure of Promotion. — In General, the type of examination to be given is that prescribed for enlisted men prior to discharge or retirement (par. 21118) except that officers, not including midshipmen, shall appear before a board of medical examiners. The examination may be conducted at a naval hospital if the officer so elects. The report on Navmed-Y shall be submitted to the Bureau, and the results of the examination entered in the Health Eecord. Whenever physical defects are discovered which may have serious import, the officer shall be transferred to a naval hospital for medical survey. A report on Navmed-M shall be submitted to the Bureau on all general service personnel not physically qualified for duty at sea or on a foreign shore, special service personnel who are not physically qualified for duty ashore, and all personnel of the retired list not physically qualified for the duties assigned. This is considered necessary for the protection of individual officers and their dependents as well as the Government.
*262 21118. Physical Examination of Enlisted Men Prior to Discharge or Retirement. — 21118.1. Every enlisted man on active duty not discharged for physical disability shall be given a thorough physical examination by a medical officer prior to his discharge or retirement from active service. Whenever practicable, each man should be examined by two medical officers and a dental officer. A careful note of all physical defects, however trivial, and other data shall be made in the Health Record. Navmed-Y shall be submitted to the Bureau except when personnel being discharged are to be immediately re-enlisted. If a physical disability is found which is sufficient to disqualify the individual for re-enlistment or for continuation in the service, or if a “Special Assignment” enlisted person has incurred a disqualifying disability, he must 'be examined by a board of medical survey before discharge or release from active duty.
21118.2. The nature and location of any defect, wound, injury, or disease shall be stated in the Health Record, and in the report of medical survey when indicated, together with the opinion of the medical officer as to whether the wound, injury, or disease is likely to result in death or disability, was due to misconduct while in the service, and was incurred in, or aggravated by, service (par. 3319.9).
21118.3. When an enlisted man of the Navy is examined for transfer to the Fleet Reserve, a report of the physical examination shall be submitted to the Bureau. If the man is physically qualified for duty at sea this report shall be submitted on Navmed-Y, but if the man is not physically qualified for duty at sea this report shall be submitted on Navmed-M. (See, also, par. 2215.5).
íjí H*
Part III, Chapter 3, The Medical Survey
333. Composition of Board. — A board of medical survey shall consist, when practicable, of three medical officers. If it is inconvenient to detail three medical officers, two will suffice. In extreme cases, or on board a ship on detached service, the survey may be held by the medical officer of the ship (Art. 1198, Navy Regulations).
# % # # #
3311.2. When an officer candidate or midshipman has been undergoing treatment at a naval hospital for a severe or possibly incapacitating condition which may *263 disqualify him for appointment, he shall be ordered before a board of medical survey before being returned to duty.
•!{ H* ‡ ‡ #
(b) Section 964 of Naval Courts and Boards (1937) reads:
964. Incapacity warranting retirement. — The physical disability must be a permanent, incurable disease, or injury of such character as absolutely to disqualify for duty on the active list. Deafness, defective vision, and incurable organic diseases are examples of such a disability. If, however, the disease be curable or of such a character as to yield to treatment, then, even though a cure may require considerable time, the disability is not permanent. The test is: Is the disease or injury curable or incurable? If it be curable within a reasonable time, the officer should not be retired.
ULTIMATE BINDINGS
34. As a result of his shipboard injuries of 1944 and 1946,, plaintiff sustained a herniated intervertebral disc which permanently incapacitated him for general naval service at the time of his release from active duty on June 6, 1946.
35. On the basis of the record before the Board for Correction of Naval Eecords, as affirmed by the testimony presented at the trial in this court, it is found that the decision of the Board and the Secretary of the Navy denying plaintiff’s claim to disability retirement pay was arbitrary and unsupported 'by substantial evidence.
CONCLUSION ON LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and judgment is entered to that effect. The amount of recovery will be determined pursuant to Bule 47(c) (2).
In accordance with the opinion of the court and a memorandum report of the commissioner as to the amount due theremider, it was ordered on July 21, 1966, that judgment for the plaintiff be entered for $33,512.07.

 Bound organs which are located- between the vertebrae.